*670 OPINION OF THE COURT
Paula Hepner, J.
The petitioner filed a family offense petition seeking an order of protection against the respondent.[1] Because the respondent has been to her home on numerous occasions, she did not file an application for a confidential address asserting that disclosure of her address or other identifying information would pose an unreasonable risk to her health or safety. A temporary order of protection was issued to her, ex parte, directing the respondent to refrain from committing any family offenses against her. The order also directed the respondent to refrain from communication or any other contact by mail, telephone, email, voice mail or other electronic means with the petitioner.
The petitioner appeared with an attorney on the return date. The respondent appeared and requested an adjournment to speak with an attorney. On the next court date the respondent appeared without counsel and requested the court assign him an attorney but he did not meet the eligibility requirements. *671 When the matter could not be settled by the judicial hearing officer, it was set down for a hearing before the undersigned.[2]
Trial began on February 23, 2012 and was continued on April 26, April 30 and May 22, 2012. The petitioner testified in her own behalf and called as her witnesses Stephanie Miller, a friend whom she has known for 15 years, and Daniel Puissant, her downstairs tenant of four years. The petitioner introduced two documents into evidence. At the close of the petitioner’s case, the respondent made a prima facie motion to dismiss based upon the failure to establish an intimate relationship. The application was denied and the case proceeded to full trial on the allegations, as well as the issue of standing. The respondent testified in his own behalf and presented the testimony of Zeno Wood, a college friend and roommate whom he has known for 27 years, and Marty Kirschner, a fellow artist whom he has known for IV2 years. The respondent offered nine documents into evidence.
In summation, the respondent maintained the matter should be dismissed, in the first instance, for lack of subject matter jurisdiction because the parties were involved in nothing more than a business transaction and there is no evidence to support a conclusion that this was an “intimate relationship” as that term is defined in the statute. Secondly, with regard to the three incidents alleged as a basis for obtaining an order of protection against him, although the respondent admitted engaging in the conduct and acts charged in the petition, he denied that by doing so he committed any family offense. Since the petitioner allegedly refused to pay him for the work he did pursuant to their contract, the respondent maintained that he was doing nothing more than asserting his constitutional right to speak out publically against an injustice committed against him by an unscrupulous employer and that his right to resort to these measures as a means to collect from the petitioner the money she owed him is protected speech.
*672 The petitioner maintained there is subject matter jurisdiction and the petition should not be dismissed as an “intimate relationship” is established based on their numerous, lengthy chats and emails and the three dates they had between January and mid-February 2010 before they entered into a business relationship. Decision was reserved in order to give the court an opportunity to review evidence in the record and to consider the points and authorities cited by counsel in their summations.
Findings of Fact
The court, having had the unique opportunity to hear the testimony of the parties and their witnesses, observe their demeanor, assess their veracity and review the documentary evidence admitted into evidence, now makes the following findings of fact based on the material, relevant, credible and competent evidence in the record.
Shannon M. described herself as an “executive recruiter for ad agencies and brand consultancies in New York” and is also an adjunct professor in a graduate program in strategic communications. Michael C. described himself as a “carpenter woodworker who makes furniture and makes art that basically deals with the intersection of social action and aesthetics and social movements.”
It is uncontroverted that the parties first met on January 1, 2010 when they exchanged messages on JDate® which bills itself as “the premier Jewish singles community online.” The petitioner testified the respondent asked her out on a date on January 2, 2010 but she declined because she had a three-month-old son. She testified they had “lots of e-mails and G chats” with “lots of flirty stuff.” Over a period of six weeks beginning in January, the petitioner testified the respondent came over three times to hang out at her house where they sat on the couch and drank beer but she could not recall the dates and had no records, tape recordings or a video of the times she claimed they met. Because of her infant son, they never went out together nor did they have sex together. The petitioner acknowledged their relationship changed to a business one after she learned the respondent was a carpenter and she asked him to baby proof her stairs by repairing the “broken spindles and a shakey one” which he said he could do. The petitioner testified that she contracted for these repairs with the respondent on March 2, 2010. The petitioner could not recall the time before March 2 that the respondent had been to her house. She said *673 the respondent completed the work in June 2010. She paid him his fee minus $200 for one spindle he didn’t do and they agreed that she would deduct that and he would keep the spindle.
The respondent acknowledged that he was having electronic conversations with the petitioner prior to January 2010. He testified he “lost interest in the Petitioner in a romantic way around December 6 or 7.” Seconds after saying this, the respondent admitted they “engaged in some flirty language” and advanced the time line saying his “actual interest in meeting [the petitioner] ended January 7 of 2010.” The respondent did not deny the petitioner’s claim that he asked her out on January 2, 2010 which is consistent with this. The respondent testified he told the petitioner this when “[he] bowed out of meeting her,” but the date of that meeting was never revealed. The respondent denied that he hung out at the petitioner’s home on three occasions between January 2 and mid-February talking and drinking beer and denied that they dated. The respondent maintained that he “met [the petitioner] only one time on one evening in February [the 23rd] for the exclusive purpose of looking at her staircase which was in disrepair.” The respondent conceded that their conversations were friendly, and were established on a dating site but he maintained that the relationship had never been “consummated with any kind of physical, same space, same time meeting in a real time and place until the actual event of [him] going to look at [the petitioner’s] staircase.”
According to the respondent they met a second time on March 2, 2012 when he brought the contract to the petitioner for signature. The respondent introduced into evidence a copy of the contract the petitioner executed on March 2, 2010 authorizing the respondent to perform the work. The respondent testified in mid-April or May the petitioner requested that he perform further work on the stairway, and do certain things in the kitchen and bathroom at an additional cost. While a second contract does not appear to have been executed, the respondent introduced into evidence an email from May 11, 2010 essentially confirming the work to be done and setting a price for the extra labor and supplies. The petitioner was never questioned about whether she and the respondent discussed this additional work or made a financial agreement to cover the cost. The respondent testified that at all times he went to the petitioner’s house subsequent to March 2, 2010 it was for the “express and sole purpose of repairing the staircase and other carpentry related *674 tasks.” The respondent conceded the parties did not have sex and denied they engaged in any conduct that would qualify the relationship as “intimate.”
The credibility of each party’s claims is illuminated by two chat logs from February 10 and February 22, 2010 entered into evidence and three emails from January 13 and 14, 2010 and February 24, 2010 that were referenced in each party’s testimony. These chat logs and emails confirm the parties had several conversations between January 1 and February 23, 2010. By the second week of January, the respondent had begun dating another person. The respondent testified about an email he received from petitioner on January 13, 2010 in which she said she noticed he had “pulled his profile” from JDate® and mentioned something about him meeting the “woman of his dreams.” The respondent testified about an email dated January 14, 2010 that he sent in response acknowledging that he had met such a woman and testified the petitioner wished him well.[3] While the parties evidently were engaged in exploratory conversations prior to this, there is no evidence to establish they had any dates or engaged in any other activities during this time that would have developed some personal history between them.
The respondent maintained there was no other communication between them until February 10, 2010 and indeed the next document entered into evidence was a 2[1]/2-hour chat log from that date which began on February 10, 2010 at 12:49 p.m. and continued through 3:14 p.m. When the respondent saw in his instant message folder that the petitioner was online, he initiated a chat session with her that began with him saying, “Ciao Ms. M.” and she replied, “Hey you! How are you?” It is obvious she was surprised to hear from him since in their prior exchange he let her know he was not interested in her. Understandably, the first question the petitioner asked him was, “how’s your new love interest going?” to which he replied, “she’s groovy.” Hoping to receive a different response the petitioner answered, “what a shame” to which the respondent answered, “timing is everything” and she countered, “yes I’ve got a real timing issue.”
The chat continued for another 15 minutes with the two of them discussing their good or bad luck with online dating ser *675 vices and the “stupid things they did” when they were young, like drinking and driving. Forty minutes into the conversation, the respondent mentioned that in the past he had been employed to fix up buildings in Philly for investors. As a result of learning he had this skill, the petitioner asked him if he would consider doing a small job in her brownstone. Five minutes later he said he would come and take a look at it. For the next half hour, the conversation sauntered around the type of “small talk” that is connected with the “getting to know you” stage of a relationship. At 3:05 p.m. the parties discussed setting up a time for the respondent to look at the petitioner’s staircase and agreed that any day after 8 p.m. would be good. The petitioner said, “you have my cell phone . . . you can text or call” to firm up the plans. The conversation returned to traversing areas of potential “common ground” between the parties for another seven minutes before it ended.
Several new facts about this relationship are revealed in this chat which are important to assessing the veracity of the parties. First, it is clear the petitioner had given the respondent her phone number prior to this day. Second, it is evident that the petitioner was still interested in pursuing the respondent because the first question she asked him was about his new love interest. Third, when the conversation turned to the work the respondent had done in Philly, it is apparent that, prior to this moment, the petitioner had no idea the respondent was a carpenter. This disclosure prompted her to begin relating her bad experiences with contractors in New York, describing the work she needed to have done on her house and lamenting that the job was “too small” for most workmen to bother with. Even after learning that the respondent was still unavailable, the petitioner pursued the respondent for a full hour and 20 minutes before she said, “can you do staircase stuff?” The respondent’s claim that the February 10 communication was about the staircase from the outset and its purpose was to discuss business is contrary to the evidence in the record.
The evidence reveals that the parties’ next contact took place on February 22, 2010 when another chat, also originated by the respondent, began at 1:27 p.m. and ended at 1:54 p.m. The respondent opened with some discussion about the Olympics and then moved to the “hows yous.” Six minutes into the conversation, the petitioner asked the respondent if he was free and whether he could come over around 8:00 p.m. to see her “never done house and assess and have a beer.” When the respondent *676 accepted, she gave him her address and described her house as the one with “a dead looking hydrangea in front under old snow.” She told him the doorbell does not work and said he can knock on the window or call her cell number which she repeated for him. The next 20 minutes of the conversation returned to chatter about coffee shops in Chelsea, teaching, baking, baby presents, sidewalk food vendors and swimming in the Gowanus. Ultimately the respondent “begged out of it” and did not go to the petitioner’s home on February 22, 2010. The respondent told the petitioner he could come the next day, February 23, 2010, which he actually did. The respondent conceded that their conversations were friendly, and were established on a dating site but maintained that the relationship had never been “consummated with any kind of physical, same space, same time meeting in a real time and place until the actual event of [him] going to look at [the petitioner’s] staircase.”
As with the February 10, 2010 chat, the chat from February 22, 2010 also supplies new facts about the parties’ relationship that are relevant to assessing the parties’ credibility. First, it establishes that the respondent’s initial visit to the petitioner’s home, that was to be on February 22, 2010, took place on February 23, 2010 and the petitioner’s claim that they had three dates in her home from January through mid-February is contrary to the evidence in the record. If the respondent had already been to the petitioner’s home on three occasions, she would not have had to give him her address and details to find her house. Second, this chat establishes that February 22, 2010 was the point in the parties’ association where the relationship turned from social to business as the respondent was invited to the petitioner’s home for drinks and to view and discuss the contemplated repair job. The respondent’s claim that at all times after they met, his contact with the petitioner was in a business context is contrary to the evidence in the record.
The following day, February 24, 2010, the respondent testified he received an email from the petitioner in which she said, with reference to their meeting the day before, “it was nice to have finally talked to you and that I know we’ve only talked once but it was really nice to talk to you.” The petitioner did not testify in rebuttal that she never sent such a message to the respondent. The significance of this email is that the petitioner acknowledged this was their only meeting thus far. It is further corroboration that the parties had not dated three times prior to mid-February.
*677 Conclusions of Law
Family offense proceedings commenced in the Family Court are “civil proceedings designed to stop violence, end family disruption, and provide protection, while those commenced in a criminal court are criminal actions for the purpose of prosecuting an offender, which may result in a criminal conviction” (Matter of Eileen W. v Mario A., 169 Misc 2d 484, 486-487 [Fam Ct, NY County 1996] [citations omitted]). To achieve these goals, selected crimes in the Penal Law are defined as family offenses[4] when they are committed between spouses or former spouses, or between parent and child or between members of the same family or household. As the court discussed in Matter of Rollerson v New (28 Misc 3d 663, 665 [Fam Ct, Kings County 2010]),
“the purpose of Family Court proceedings is to provide immediate redress from violence or from specified criminal acts committed by a member of the victim’s family or household without requiring an arrest or criminal prosecution. The statute attempts to provide persons in intimate relationships with alternatives to criminal prosecution through proceedings which are essentially civil in nature, while also providing meaningful protection from abuse.”
Under the definition in paragraph (e) of section 812 (1) of the Family Court Act, the phrase, “members of the same family or household,” includes “persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time.” In determining whether an “intimate relationship” exists between the parties, the legislature set forth a dearth of factors for the courts to consider.
*678 “Leaving more precise definition to the courts, the legislature suggested factors to be considered in determining whether an intimate relationship exists, including but not limited to the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship” (Lodichand v Kogut, 30 Misc 3d 891, 899 [Sup Ct, Nassau County 2011] [internal quotation marks omitted]).
However, the legislature did exclude from the statute’s protection “casual acquaintances” and “ordinary fraternization between two individuals in business or social contexts.” Guiding the way trial courts should examine the facts of a particular relationship, the Appellate Division, Third Department, suggested that “[b]ecause the Legislature declined to include a definition of the term ‘intimate relationship’ in Family Ct Act § 812 (1) (e) . . . courts should construe the term using its usual and commonly understood meaning” (Matter of Jessica D. v Jeremy H., 77 AD3d 87, 89-90 [3d Dept 2010] [some internal quotation marks omitted]).
Having left it to the courts to determine on a case-by-case basis what the contours of this protected class are (Matter of Seye v Lamar, 72 AD3d 975 [2d Dept 2010]), any analysis of how a statute should be interpreted must begin with its legislative history. In Jessica D. (77 AD3d at 90), the Third Department wrote that the
“Legislature intended to extend the statute’s reach to just these types of relationships—
“(1) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household and (2) persons who are or have been in an intimate or dating relationship regardless of whether such persons have lived together at any time.” (Internal quotation marks omitted.)
Earlier opinions from the trial courts reached the same interpretation. Referencing the memorandum of Senator George H. Winner, Jr., in support of the bill which he introduced that would eventually amend section 812 to include intimate relationships, the trial court held in Matter of Mark W. v Damion W. (25 Misc 3d 1148, 1150 [Fam Ct, Kings County 2009]) that “[t]he legislative history of the 2008 Amendment indicates that *679 the legislature intended to extend the protections of the Family Court Act primarily to dating couples who are not married or who do not share a child in common, and same-sex partners.” In Rollerson (28 Misc 3d at 665), the trial court found “[t]he legislature intended by amending the statute, to extend these benefits to nontraditional and unsolemnized relationships, which are nonetheless ‘intimate.’ Examples include dating couples, couples who do not share a child in common, and same-sex partners.” In Matter of K.J. v K.K. (23 Misc 3d 754, 759 [Fam Ct, Orange County 2009]) the trial court held that an
“intimate relationship is intended to include such human relationships as are unique or special, subject persons to greater vulnerability and potential abuse because of their nature, and are not merely based on social contacts and friendship . . . they are to be regarded as being members of the same family or household.”
What may be considered in an “intimate relationship” depends on the nature, frequency of interaction between the persons and the duration of the relationship” (Matter of Maria B. v Ndoc S., NYLJ, Apr. 10, 2009 [Fam Ct, NY County 2009]).
The Court of Appeals in Matter of DaimlerChrysler Corp. v Spitzer (7 NY3d 653, 660 [2006]) has instructed the trial courts that “[w]hen presented with a question of statutory interpretation, our primary consideration ‘is to ascertain and give effect to the intention of the Legislature’ ” (citing Riley v County of Broome, 95 NY2d 455, 463 [2000]). Based on the analysis of the evidence in this record, it is clear that the contact and communication began as just ordinary fraternization in a social context. When the parties lost interest in each other, she by “discovering [he] was crazy,” and he by meeting “the girl of his dreams,” the conversation changed to ordinary fraternization in a business context.
The evidence is clear that in January and February 2010, the parties were prospecting for an intimate relationship and their contact over the Internet focused on getting to know each other. Since it is not uncommon for people who meet over the Internet to ask for a date to meet the person in a public place to see if they live up to the picture and promotion contained in their profiles and whether there is any “chemistry” between them, the petitioner’s testimony that the respondent immediately asked her for a date on January 2, 2010 is not contrary to the conventions of online dating.
*680 There is no evidence the content of the parties’ chatting and emailing went beyond casual conversation about each other’s history and interests. The personal content revealed in their conversations was innocuous. There is no evidence of sexual undercurrents or emotional investment in their chatting or emailing. Online dating in the open market of the Internet is not monogamous and the conversations these parties were having with one another could have been one of many chat or email exchanges each person was having with a variety of potential lovers or companions. In these exchanges the parties did not reveal the kind of information from which it could be assumed a personal relationship existed. The flirtations revealed in these conversations were precisely what the respondent labeled them — “just banter” between two casual people who have never met “and not the stuff of an actual true intimate relationship.” The respondent’s final attempt to show that theirs was not an intimate relationship was based on the domestic incident report which the petitioner filed on August 29, 2011 in which she identified the relationship of the victim to the perpetrator as “employee, not boyfriend, ex-boyfriend or intimate partner.”
There is no evidence that these chats or emails were anything but infrequent and only one chat log admitted into evidence was extensive. The petitioner did not testify regarding how many online chats, text messages or emails took place between them during this period, how long they lasted, how often they occurred and what their content was. Even though the petitioner ultimately gave the respondent her cell phone number, there is no evidence the dialogue between them moved off the printed electronic page to a live, in-person cell phone conversation. There is no evidence the parties utilized Google Talk or Skype software with a webcam to engage in voice and video chats online. Within a few weeks the parties’ flirtation fizzled without incident and their attention quickly turned from a social purpose to a business one.
For all of the foregoing reasons, the court finds there is no intimate relationship between the parties and that, being a court of limited jurisdiction, the Family Court lacks subject matter jurisdiction to entertain a family offense between them in the Family Court.
“The Family Court is a forum for the resolution of disputes between persons who are intimately connected through familial ties or by emotional bonds arising from domesticity or companionship, even *681 though unsolemnized by marriage or not otherwise recognized by law. The legislature, by amending the statute, did not intend to create a forum for quasi-criminal proceedings brought by casual acquaintances or persons in commercial relationships who are unable to get prompt redress from the police for their grievances” (Rollerson, 28 Misc 3d at 666).
This is not to say that online dating may not provide the foundation for an intimate relationship, but on this set of facts and circumstances, it was not. The case law that is evolving around “intimate relationships” has set a high standard for what constitutes an intimate relationship and the petitioner failed to meet the burden of demonstrating that such a relationship existed.
As a consequence of this determination, the court need not reach the respondent’s constitutional arguments for dismissal. Accordingly the respondent’s motion to dismiss the petition is granted, however, pursuant to section 813 (a) of the Family Court Act, dismissal of the petition is stayed for two weeks in order to give to the Kings County District Attorney “reasonable notice . . . [and] the opportunity to be heard . . . [on whether this matter will] be prosecuted as a criminal action in an appropriate criminal court.” Pursuant to section 813 of the Family Court Act, the temporary order of protection in the Family Court is continued until a response is received from the District Attorney and the matter is adjourned to July 26, 2012 for a response from the District Attorney and further orders consistent with their determination.

. In the instant petition which was filed on September 21, 2011, the petitioner alleged that the most recent incident was on September 20, 2011 at her residence:
“Respondent e-mailed Petitioner with a bizarre message that his ‘protests are going to start again soon.’ His protests involve his delusional belief that Petitioner owes him money for carpentry work done inside her brownstone IV2 years ago. Petitioner has long since paid the Respondent for services rendered, and after she received last night’s e-mail, she made it clear to him via e-mail that she was not going to pay him a second time for the work already paid for. That led to another e-mail from Respondent this morning, in which he continued his harassing and threatening behavior telling her in the e-mail that ‘this is going to stop;’ ‘just pay me, pay me, pay me.’ He also said to Petitioner that he was ‘really enjoying this’ and that she should ‘be logical and just pay him.’ Additionally on 8/29/11 at 10:30 a.m. at Petitioner’s residence, Respondent arrived with an unidentified man, both unannounced and uninvited, and they both screamed and banged on Petitioner’s front door for 45 minutes, demanding money to ‘go away.’ Petitioner called 911; Respondent overheard this call from outside the residence, which led to more screaming on his part. He left with this threatening warning: ‘We’ll be back and stronger.’ ”
A third incident, not pleaded in the petition but testified about by the petitioner and one of her witnesses, without objection, involved an encounter between the parties in Prospect Park on the evening of June 30, 2011 when she alleged the respondent intruded on her picnic with friends and began “relentlessly” talking to her and them about getting paid for the work he did on her house.

. The respondent did not file an answer pursuant to articles 4 and 30 of the Civil Practice Law and Rules to indicate those statements in the petition “known or believed by him to be untrue [or those] statements as to the truth of which he lacks knowledge or information sufficient to form a belief.” In the absence of an answer, pursuant to CPLR 3018 (a), “[a] 11 other statements of a pleading are deemed admitted.” Because the petitioner did not make a motion for summary judgment, pursuant to CPLR 3212, after the respondent failed to answer the charges and enter a denial to any of these allegations or raise any issues of fact requiring a trial for their resolution, the matter proceeded to a hearing.

. The petitioner was shown a document purporting to be an email exchange on January 13-14, 2010 and another one from an email exchange on February 24, 2010 but neither was admitted into evidence.

. The family offenses set forth in section 812 (1) of the Family Court Act are:
“disorderly conduct, harassment in the first degree, harassment in the second degree, aggravated harassment in the second degree, sexual misconduct, forcible touching, sexual abuse in the third degree, sexual abuse in the second degree as set forth in subdivision one of section 130.60 of the penal law, stalking in the first degree, stalking in the second degree, stalking in the third degree, stalking in the fourth degree, criminal mischief, menacing in the second degree, menacing in the third degree, reckless endangerment, criminal obstruction of breathing or blood circulation, strangulation in the second degree, strangulation in the first degree, assault in the second degree, assault in the third degree or an attempted assault, criminal obstruction of breathing or blood circulation or strangulation.”