Matter of JB (LI) (2024 NY Slip Op 51357(U))

[*1]

Matter of JB (LI)

2024 NY Slip Op 51357(U)

Decided on September 30, 2024

Family Court, Wyoming County

Kibler, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 30, 2024
Family Court, Wyoming County

In re Family Offense Petitions Filed Against JB by LI, TT, and KB

Docket No. O-0048-00150-24

The petitioners were represented by Brian P. Degnan, Esq.
The respondent was represented by Valerie G. Gardner, Esq.

Keith D. Kibler, J.

Background
On March 12, 2024, three residents of the Aberth House filed separate family offense petitions against another common resident. The Aberth House is a residential group home for people with intellectual and developmental disabilities. The petitions generally alleged that the respondent broke and threw personal property, houseware, and appliances and attacked, yelled, and acted aggressively towards staff. The parties were represented by counsel throughout the proceedings. The petitioners were represented by Brian P. Degnan, Esq. The respondent was represented by Valerie G. Gardner, Esq. and appeared through her permanent guardian, the Commissioner of the Erie County Department of Social Services.[FN1]

On March 19, 2024, the respondent filed a motion to dismiss, arguing the petitions failed to state a cause of action. Specifically, the respondents argued that the petitions were insufficient because the petitioners merely checked the box on the official court forms alleging that they "live together." The Court denied the motion based upon the case of Kristina L. v. Elizabeth M., 156 AD3d 1162 (3d Dept. 2017). In Kristina L., the petitioner also utilized an official court form and checked the box that the parties "lived together in the past." Id. at 1163. Since the Third Department found this was sufficient to confer jurisdiction, the Court in this case also found that the petitions would survive the motion to dismiss. Consequently, the Court denied the respondent's motion to dismiss, pursuant to its Order on Motion dated April 15, 2024.
The nature of the relationship between each petitioner and the respondent was discussed during other court appearances. It is undisputed that each petitioner and the respondent are and [*2]were never related by consanguinity or affinity. They never had a child together or engaged in sexual relations. They simply live together. Given the primacy of this issue, the Court conducted a hearing on whether it had subject matter jurisdiction on September 23, 2024. See Woldeselassie v. Colon, 227 AD3d 725 (2d Dept. 2024); Minor v. Birkenmeyer, 200 AD3d 1044 (2d Dept. 2021).
Prior to conducting the hearing on whether the Court had subject matter jurisdiction, under Section 812(1) of the Family Court Act, the Court inquired as to the potential bases for it. Counsel for the parties acknowledged that the only potential basis for the Court to have subject matter jurisdiction was if the parties were "members of the same family or household" and had or were "in an intimate relationship." FCA § 812(1)(e). Present for the hearing were all the petitioners, their counsel, the permanent guardian of the respondent, and the respondent's counsel. The respondent was not present.
Findings of Fact
The parties live together in the Aberth House. Each petitioner has lived there for varying periods of time. The respondent has lived there for about the past year. The Aberth House consists of three floors. The basement has office space, the first floor has common areas, including a living and dining room, a kitchen, and a bathroom, and the second floor has individual bedrooms for each resident and a common bathroom. Each bedroom has a door that locks.
The residents may participate in shared or group activities. For example, they may eat meals, watch television, or go shopping together. Group activities are not mandatory, and each petitioner engages with the respondent to a different degree. The first petitioner indicated that she and the respondent eat dinner together every night, watch television together, and sometimes go shopping or to the movies together. The respondent has been in the first petitioner's bedroom, upon invite, about two to three times since the respondent moved into the house; but the first petitioner has never been invited into the respondent's bedroom. The first petitioner acknowledged that she is not friends or has a "personal" or "tight" relationship with the respondent and only engages with her because she is a resident of the Aberth House. They have never been in a sexual or romantic relationship.
The second petitioner indicated that she engages in activities with the respondent, they are friends, and they each have been in each other's bedrooms. The second petitioner acknowledged that she has never been romantically or sexually involved with the respondent and does not consider the respondent to be her girlfriend or partner.
The third petitioner indicated that she has not been in the respondent's bedroom, and the respondent has never been in her bedroom. She stated that they are not friends, do not eat together frequently, and have only engaged in one activity outside of the residence together. They have never been in a sexual or romantic relationship.
Intimate Relationship
The family court has jurisdiction over enumerated offenses committed "between spouses or former spouses, or between parent and child or between members of the same family or household." FCA § 812(1). In 2008, the Legislature expanded the definition of "members of the same family or household" to include "persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time." Raigosa v. Zafirakopoulos, 167 AD3d 748, 749 (2d Dept. 2018); see [*3]FCA § 812(1)(e). "The legislative history of the 2008 Amendment indicates that the legislature intended to extend the protections of the Family Court Act primarily to dating couples who are not married or who do not share a child in common, and same-sex partners." Mark W. v. Damion W., 25 Misc 3d 1148, 1150 (Kings Cnty. Fam. Ct. 2009). The Third Department also explained that the intent of the amendment was to reach "(1) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household and (2) persons who are or have been in an intimate or dating relationship regardless of whether such persons have lived together at any time." Jessica D. v. Jeremy H., 77 AD3d 87, 90 (3d Dept. 2010).
In determining whether an intimate relationship exists, the court may consider the following factors: "the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship." FCA § 812(1)(e). "Neither a casual acquaintance nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an intimate relationship." Id. (internal marks omitted). The recency of the termination of the intimate relationship is not a consideration. See Willis v. Rhinehart, 76 AD3d 641, 643 (2d Dept. 2010). The determination of whether a relationship is intimate is made "on a case-by-case basis." Seye v. Lamar, 72 AD3d 975, 976 (2d Dept. 2010).
Not surprisingly, "courts have found that persons who have dated or were engaged in a sexual relationship are covered within the meaning of intimate relationship." Jose M. v. Angel V., 99 AD3d 243, 247 (2d Dept. 2012) (collecting cases finding relationships intimate where they involve sex); see Martinez v. Toussaint, 222 AD3d 647, 648 (2d Dept. 2023) (intimate relationship existed where parties were previously acquainted and had known each other for several years before they engaged in sex on two occasions); Sonia S. v. Pedro Antonio S., 139 AD3d 546, 547 (1st Dept. 2016); Samantha I. ex rel. Emily K. v. Luis J., 122 AD3d 1090, 1091-1092 (3d Dept. 2014) (an intermittent, dating, and sexual relationship of juveniles was intimate); Jessica D., 77 AD3d at 88 (intimate relationship exists where petitioner, a married woman, who lives with her husband, filed against her boyfriend with whom she has an intermittent sexual relationship).
There is not, however, a requirement that the parties engage in "sexual intimacy" for a relationship to be intimate within the meaning of the statute. Raigosa, 167 AD3d at 749 (roommates who shared a dwelling could be engaged in an intimate relationship in the absence of a sexual relationship); see Arita v. Goodman, 132 AD3d 1108, 1109-1110 (3d Dept. 2015). Intimacy may not be present in the initial "getting to know each other" stage of communication between parties looking for an intimate relationship where "[t]here is no evidence of sexual undercurrents or emotional investment." Shannon M. v. Michael C., 36 Misc 3d 669, 680 (Kings Cnty. Fam. Ct. 2012).
With respect to the factor concerning the nature or type of relationship, the cases reveal that cohabitation of the parties is relevant but not dispositive. The existence of a landlord-tenant relationship does not create intimacy. See Rollerson v. New, 28 Misc 3d 663, 666 (Kings Cnty. Fam. Ct. 2010) (intimate relationship not found where the parties share a common dwelling, have access to common areas, but the relationship is defined by the tenancy and there is "no personal history" between the parties). The Rollerson case suggested that intimacy may arise from such behaviors as sharing meals and common living areas. Id. Also, an intimate relationship does not necessarily exist where the parties live in the same apartment building, see [*4]Woldeselassie, 227 AD3d at 726 (resident living in same apartment building as building's superintendent) or the same apartment, see Leff v. Ryan, 134 AD3d 939, 940 (2d Dept. 2015) (no intimate relationship found where petitioner hired respondent to move into his apartment and provide handyman and personal care assistance services and there was no romantic relationship between them); Arita, 132 AD3d at 1110 ("the mere fact that the parties cohabited is insufficient to establish the requisite intimate relationship given the multifactoral inquiry prescribed by the Legislature").
In the absence of a sexual relationship, other types of relationships have been held to be intimate for purposes of the statute. One court observed that "[i]t appears intimate relationship is intended to include such human relationships as are unique or special, subject persons to greater vulnerability and potential abuse because of their nature, and are not merely based on social contacts and friendship." K.J. v. K.K., 23 Misc 3d 754, 759 (Orange Cnty. Fam. Ct. 2009) (cited with approval by Jose M., 99 AD3d at 248-249).
Non-sexual relationships generally should be "direct" and not based upon a connection with a third party, such as a child or a significant other. Watson v. Brown, 225 AD3d 613, 615 (2d Dept. 2024); Christina R. v. James Q., 185 AD3d 1240, 1241 (3d Dept. 2020) (no intimate relationship where mother and her child's paternal uncle do not live together, and their interaction was limited to family events during her one-year marriage to the respondent's brother, even though they knew each other for eight years); Royster v. Murray, 157 AD3d 701, 702 (2d Dept. 2018) (relationship not intimate where petitioner was the live-in girlfriend of the respondent's brother, the parties "have never resided together," and "their contact with one another has been purely by happenstance," even though they live in the "same building"); see Jose M., 99 AD3d at 247-248 (collecting cases where an intimate relationship was not found because the connection between the parties was based upon a third party); Tyrone T. v. Katherine M., 78 AD3d 545 (1st Dept. 2010) ("petitioner's claim that he was the boyfriend of respondent's sister, and a friend of respondent, was insufficient to establish an 'intimate relationship'"); Seye, 72 AD3d at 977 ("parties have no direct relationship and are only connected by virtue of the fact that the petitioner and the respondent's brother, who are not and never were married, have a child together"); Mark W., 25 Misc 3d at 1148.
The Court examined reported decisions finding non-sexual, intimate relationships under the statute. Although the caselaw is developing, the intimate relationships fall within the following four categories:
• Quasi-Stepparent-Stepchild. See Jose M., 99 AD3d at 248-249 (mother's live-in boyfriend was in an intimate relationship with mother's daughter, creating jurisdiction over father's family offense petition against the boyfriend on behalf of the daughter); R.M.W. v. G.M.M., 23 Misc 3d 713, 716 (Nassau Cnty. Fam. Ct. 2009).
• Quasi-Stepparent-Parent. See Jasmin NN. v. Jasmin C., 167 AD3d 1274, 1275-1276 (3d Dept. 2018) (intimate relationship existed between wife and mother of husband's children where women have known each other for five years, regularly cohabitate with each other and the husband, are involved in coparenting, and wife considers herself stepparent of other woman's children); Winston v. Edwards-Clarke, 127 AD3d 771, 773 (2d Dept. 2015) (intimate relationship established where petitioner was living with the respondent-mother's children and their father, acting as a stepmother to the respondent-mother's children, and there was frequent contact between the parties to arrange for the respondent-mother's visitation with her children).
• Not-Related Grandparent and Parent of Common Child. See Robinson v. Benjamin, 160 AD3d 877 (2d Dept. 2018); Morales v. Roman, 30 Misc 3d 297, 298-299 (Bronx Cnty. Fam. Ct. 2010) (intimate relationship established where petitioner is the mother of respondent's grandchild and "[t]he parties can be expected to have a relationship for a lifetime where as here the father maintains a relationship with the child and respondent maintains a relationship with her son and her grandchild").
• Long and Close Friendships. See Eno v. Illovsky, 214 AD3d 865, 867 (2d Dept. 2023) (intimate relationship found where "the parties had known each other for more than 30 years, that they had a close relationship as sisters-in-law for most of this period, during which they lived within one mile of one another, frequently had dinner together, engaged in social activities in each other's homes, attended most holiday celebrations together, supported each other during times of devastating family illnesses, and assisted each other with their respective children"); Charter v. Allen, 206 AD3d 994, 996 (2d Dept. 2022) (parties knew each other "for more than 20 years;" "the respondent and the petitioner's sister held themselves out as husband and wife;" "the petitioner and the respondent engaged in general social activities at each other's homes, attended holiday and birthday celebrations together, and traveled together;" "[t]he petitioner's sister and the respondent had a daughter together who identified the petitioner as her aunt;" and the parties lived in a three-family home, owned by the mother of the petitioner, in separate units for a period of time).
The categorization of the cases noted above should not be read to limit other types of intimate relationships from being recognized by other courts. This Court categorized the cases for the purpose of analyzing the development of the caselaw to assist it in deciding the present case.
Analysis
The testimony of the witnesses did not demonstrate the existence of an intimate relationship between any of the petitioners and the respondent. The factors the court may consider include the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. There was no testimony that any of the petitioners knew or had contact with the respondent before she moved into the Aberth House. By all accounts, the petitioners became acquainted with the respondent after she moved there about one year ago. Living together for a year can foster intimacy between housemates, but it does not guarantee it. Although the parties engaged in shared experiences like eating meals, watching television, going shopping together, and spending time with each other, the evidence did not show that those experiences resulted in a close connection between any of the petitioners and the respondent.
The cases cited above show that the concept of intimacy can take many forms. Central to any form of intimacy is a close connection between individuals. People connect and form close bonds in several ways. An obvious form is sexual intimacy, which is undisputedly not present in this case. Intimacy may develop emotionally through the sharing of feelings, thoughts, and vulnerabilities. Connection can also be strengthened by physical affection, through non-sexual touch like hugging or holding hands; it can develop intellectually, by engaging in conversations, sharing ideas, or discussing interests; or spiritually, by exploring beliefs, values, or practices together. Another form of connection is illustrated by the love between a parent and child, which may be characterized by unconditional support, protection, sacrifice, guidance, and emotional [*5]bonding.
In this case, however, there was no evidence that any of the petitioners and the respondent share with each other their personal or private thoughts, feelings, secrets, or desires. There was no evidence that there is trust between any of the petitioners and the respondent allowing them to be open, honest, and vulnerable with each other. There is no evidence of sexual relations, emotional bonds, or a warm, close friendship developed through a long association.
The petitioners seem to ask this Court to find that the living arrangements of the parties necessarily give rise to an intimate relationship. In other words, they ask this Court to find an intimate relationship where individuals reside together in a home with shared living spaces and the opportunity to engage in communal experiences. If the Court were to rule as the petitioners ask, the relationships in many communal living situations—for example, individuals living in nursing homes, college dormitories, monastic communities, and housing cooperatives—would become intimate by default without the requisite case-by-case analysis to examine the particular nature of a relationship between two individuals. The was not the intent of the Legislature in amending the statute in 2008.
When individuals live together in the communal circumstances shown in this case, it certainly can foster intimacy. Although some housemates may become very close, others may not connect. In this case, there is insufficient evidence of intimacy between any of the petitioners and the respondent in this case. Consequently, the Court finds that there is not an intimate relationship between any of the petitioners and the respondent, and the Court lacks subject matter jurisdiction over the proceedings under FCA § 812(1). Therefore, it is hereby
ORDERED, that the petitions are dismissed.
Dated: September 30, 2024
ENTER
Hon. Keith D. Kibler

Footnotes

Footnote 1:The Court's file contains a document entitled Order Appointing Permanent Guardian of the Person and Property of JB. It is dated July 16, 2021 and was issued pursuant to Article 81 of the Mental Hygiene Law by Hon. Paul B. Wojtaszek.